Thank you. Hey, good morning, your honors. My name is Karen Lindholt, and I am here on behalf of petitioner SAFE Air For Everyone. SAFE brought this petition for review because the United States Environmental Protection Agency violated the law when it approved the federal implementation plan under the Clean Air Act for Indian Reservations in Idaho. I will be referring to this as the FAR, otherwise known as the Indian Reservations in Idaho, Oregon, and Washington. The FAR took effect on June 7, 2005. It is important for this court to consider the purpose of the FAR when determining whether or not this rule was arbitrary and capricious. Specifically, my clients have challenged three and 49.138. EPA's purpose in adopting the FAR was, one, formally level the playing field. In other words, to, quote, provide people living within reservation boundaries with air quality protection similar to surrounding areas and to require that emissions from sources located within reservations. Two, to establish emission limitations and other requirements for air pollution sources. And three, to establish a framework for air quality protection on Indian reservations, especially important to vulnerable populations, the young, the sick, and the elderly. Those all can be found in the administrative record. What are the statutory requirements, however? In other words, what I'm asking is, I don't understand you to be saying that the statute required the agency to pass, to enact, for example, the limitation on agricultural burning independently as opposed to the differentiation that you're complaining about. You are correct, Your Honor. In reviewing the rule, EPA chose, based upon all the evidence it found when reviewing the various air pollution sources on the reservations, it concluded that it was appropriate that this FAR be adopted. And EPA concluded that one of the particular air pollution problems on the reservations was, in fact, this agricultural burning. And thus, EPA took that first step. And in doing so, the EPA requires that its actions not be arbitrary and capricious. But could EPA have done nothing? Yes, EPA could have done nothing. However, the fact is, it chose to do something. And in doing that, it must do that within the confines of the law. Each year, between mid-July and early November, on the Coeur d'Alene Reservation in Idaho, approximately 30,000 acres of grass field wheats that were burned. On any particular day, between 2,000 to 5,000 acres of the residue was burned. Of course, across the border in Washington, the The three arguments raised by my clients on the arbitrariness of this, the first, that the EPA arbitrarily exempted the Coeur d'Alene tribe from the permitting process. This is for Section 49.133. It's – it's – it looks as if the main difference in the Coeur d'Alene permitting and permitting for the other two tribes has to do with why the burning methods and with the weight of the materials. Why, in a nutshell, do those differences make any difference? I'm glad to hear Your Honor read this closely. And I do think the devil is in the details here. And I guess, stepping back, I think there is one – there are some other differences. One, my client or any other individual who is aggrieved by that smoke coming from the reservation when, since the EPA exempted the Coeur d'Alene reservation, my clients do not have the opportunity to pursue their judicial review options pursuant to the APA. On the Nez Perce reservation in the Umatilla, where the EPA is permitting, if someone's aggrieved by that permit, they can follow the process for appealing within the agency. Since the EPA has exempted the rez, it's completely within the Coeur d'Alene reservation's jurisdiction, so my clients don't have a remedy there. However, on the issue of the permits, first of all, when EPA is issuing the permit, all of the EPA will know. For example, the plot plan showing the location of each proposed burning area in relation to the property lines and indicating the distances and directions of the nearest residential, public, and commercial properties, roads, etc. So what difference does that make? I mean, that's really the heart of my question. The difference is the evidence is full. There is so much evidence in the record. What happens when the smoke travels to commercial properties, to residential areas, to public areas, people get hurt. People have died. So when the EPA has this information in front of them, I would assume they won't be presumably know where it's going to happen. I wouldn't. Well, I mean, that's what I'm trying to find out. I mean, does the plot description thing alone have significance? Yes, it does. And it would be? It would be, if I'm working for the EPA, and I am given the direction the wind is blowing that day, and I gather all the acres are burned, and I look back at the records three to four years ago, and I know, you know, this many people called in complaints, this many people went to the hospital, then I say, this permit cannot be issued on this day for 2,000 acres because we know history tells us. The Coeur d'Alene rez doesn't have that check-and-balance system. The Coeur d'Alene tribal process doesn't produce substantially similar information, just not in that format. It does not. If they do not, those who issue the permits, and, in fact, we have submitted on pages, I think, 562 to 569 of the record, I would encourage the Court to look at those permits. There is nothing that requires that in those permits. Now — It's nothing that requires a plot description. We know that. I mean, it's the same. My question is, it's the same. I mean, what difference does it make? It is a huge — If you've got similar information. The information is not similar. Because — Because? Because — let me grab a permit from the — the reservation permit simply asks, number of acres to be burned, section, township, and range. Very different from specific plots. It doesn't ask location to the nearest residential area, to the nearest school, to Highway 95, the major — They're not going to know that from the information that they've got. Correct. They will not know that. Did the Nez Perce and Umatillo tribes have any permitting system before? Well, the EPA — yes, they have been burning for years before they have permitting systems. I mean, the EPA, in general, its explanation for the difference in treatment is, A, because the other ones want — because Coeur d'Alene didn't want it, and the other tribes did. But the other one was — the other explanation is because Coeur d'Alene had a permitting system. Well, that's — that supports another of our points, and that is — But I'm asking, is it true that the Nez Perce and the Umatillo tribe had no system? There was a system. There was a system. Yes. And that's part of the problem. It is not in the record. The documents that are included describing what the Coeur d'Alene res does or does not do were not in the administrative record for the agency when making its decision. And so it is, frankly, hard to flesh out exactly who was doing what when, which is, again, part of this. And I would encourage the Court to think about, really, what was in the administrative record and before the agency when making these decisions versus what is now in the record and what is being argued after the fact when we're here in litigation. I feel like I will have failed my clients if I somehow can't explain to this Court that there is a big difference between what happens on the Coeur d'Alene reservation and, of course, the impacts speak for themselves. September 14, 2000, 6,000 acres had been burned on the Coeur d'Alene reservation. They traveled north. A woman named Marsha Mason died. The coroner wrote she was exposed. She died of a severe asthma attack because of air pollution. The facts speak for themselves. We don't have anywhere in the record that there has been that impact from the Nez Perce reservation or the Umatillo. The fact is what has been going on in the Coeur d'Alene reservation is unacceptable, and it still is to this date. Moving on, unless Your Honors have any more questions. Just to be clear about my last question. I thought that the Nez Perce and the Umatillo did not have mandatory permit systems at the time. You say that's wrong. They did. I don't have that information. Your Honor, I will look for it while the other side is going and get back to you. The fact is they do now. They have been burning several thousand acres. No, I understand that, but the rationale that the EPA gave, you're saying the Coeur d'Alene system isn't as good as what the EPA has imposed on the other two tribes. But EPA says, well, yes, but Coeur d'Alene had a system, and the other two had none. Or one had a voluntary system and one had none, and you're saying you don't know if that's true. Yes, but I'm also, I'm not just saying it's not as good. I'm saying, given the case law, it is arbitrary. Given the case law and the evidence the EPA had in front of it regarding how the Coeur d'Alene system works, it is arbitrary for them to say, we're going to exempt them. Let them go about business as usual and work with the Umatilla and the Nez Perce, because they wanted a system. It doesn't work that way. I'm sure none of the Indian reservations wanted to be regulated by the FIF. I'm sure no one wanted the FIF, but the fact is this information was presented to the EPA, and they felt the need to do something, and they did something. Moving on to the second issue, and that is that the EPA arbitrarily exempted the agricultural burning activities from their reporting requirements. And this is section 49.138, and this, of course, is applicable to all Indian reservations under the FAR. But the challenge is in the context of the Coeur d'Alene reservation. And that is, again, we have the EPA engaging in this rule because it wants to level the playing field. It wants to protect the most vulnerable. And obviously, it's getting a handle on the air pollution that is occurring on these reservations. It clearly knows agricultural burning is a problem, as it specifically identifies it and has sections dealing with it. However, it is arbitrary to then in turn say, yes, but in fact, we aren't going to require that these entities register the ag burning activities so that we know annually what the emissions are. How is it that we can really assess it? How is it the EPA can assess if they are in fact leveling the playing field and protecting the most vulnerable populations if they don't know what the annual emissions are from this agricultural burning, which we know is a huge practice, 30,000 acres. They don't know what the annual emissions are from the Coeur d'Alene reservation. We know people are significantly impacted, but we don't know. I go back to where I started from. I have a lot of trouble understanding how we review agency decisions without a legal rule. And you, we were getting from the premise that the, as I understand it, that the EPA had no obligation to, under the Clean Air Act for some reason, I don't know why, to issue any Federal rule with respect to this grass-roots. And if that's true, then how do we start deriving rules about what sub-rules they had to enact? Well, again, and I will, when I'm, I'm going to stop here quickly. When you look at the introduction to the FAR, EPA explains why it did it. And the fact is, none of these reservations on their own had adopted tribal implementation plans. Because that hadn't happened, EPA, based on the evidence, felt the need to come in with this FAR to regulate. So, it took. But it didn't have to under the Clean Air Act. You're not claiming they had any obligation under the Clean Air Act to do it. No. We're not claiming that that was the answer. So if they didn't have an obligation to do it, then why did they have an obligation if they decided to do it, to do it this way instead of that way? Because they have an obligation to comply with the Administrative Procedures Act and the case law interpreting it in the Ninth Circuit and everywhere else, which says if you take these actions, they have to be, you know, they must not be arbitrary and capricious. And we have a definition of arbitrary and capricious being treated in similar situations differently. And that's exactly what the case is here. Moreover, we. I'm not talking about the correlation problem now. I'm talking about this registration problem now. Oh, the registration.  Thank you. This gets into what is arbitrary and capricious. I submit if the purpose of the FAR is to level the playing field, is to understand the emissions and the impact of those emissions on public health, I submit that is arbitrary not to require that information be provided to the EPA. How on earth could they determine, how on earth could they answer what their purpose and goals are if they don't have this information, especially in light of what the evidence is and what the evidence shows the impacts of the burning are? The last argument my clients raised. What explanation did the agency give for not having the registration requirement? I can. Well, thank you for asking, because that is important. ER 562. EPA is not requiring the registration of agricultural burning activities under Section 4938. Several other rules established in the FAR regulate open burning, including agricultural burning. EPA believes that a smoke management program under Section 49133, Rule for Ag Burning Permits, may be designed as appropriate to require farmers to provide information on their burn activities. Well, the reality is, the permit currently doesn't require farmers to provide that information, but since the Coeur d'Alene Reservation is exempt from this provision, they will never have to provide that type of information. And the permitting, but for the tribes that are covered by the permitting system, you are getting the information. No. Well, I don't have the ---- I don't mean you. I mean, the information is being collected. It's not in the record is the problem, because this occurred that the ñ on the Nez Purse and the Umatilla, the permitting system didn't begin ñ had not begun at the time we filed this challenge. One of the things I don't guess I understand fully about the reporting or registration requirements, I mean, this is all retrospective. And so, what does that have to do with the ñ how does that affect? It has a lot. When calculations have been done, the natural combustion of the straw and wheat produce all sorts of toxins, dioxins. When we know what the quantity is, and when the EPA is faced with the quantity of the emissions of these toxins being produced, there may be violations of the law. There may be other violations. That information has never been made available and isn't available to my clients. And at this rate, it will not be available in areas where the largest amounts of field burning are going on in the north. Would it also be relevant to, in the long run, to the question of whether the exclusion of the Coeur d'Alene tribe makes sense? Because if one was to collect the information, it's to see that there was continuing to be a vast amount of emissions and considerably more emissions than the other tribes, then that would be an argument for saying that the basis for the exclusion is not about ñ Yes. Well, if that's right, then to what extent is 49.133 not served a similar purpose? Well, 49 ñ assuming the EPA chooses to make the Nez Perce tribe and the Umatilla tribe provide that type of information pursuant to the EPA permit, that could. But the fact is, the Coeur d'Alene tribe has been exempted. So even if the EPA were to require that of the Nez Perce tribe and the Umatilla, we still wouldn't know that information regarding the Coeur d'Alene tribe. And of course, bluegrass drawfish ñ Yeah, but I guess I thought its smoke management plan produced information that's substantially similar to what would be reported. Well, no? But that ñ the smoke management plan is merely, here you go, farmer. You read this document and fill out this permit that requires about four things, your address, the number of acres and what you're burning. It doesn't say, here you go, farmer. You are not getting the green light to burn until you tell me A, B, C, D, E, F, G. But that's a different question from the registration and reporting that we're talking about now. Does the Coeur d'Alene system generate the information about what's actually going on in the sky? No. Nor is it in the record that the EPA had in front of it when it made the decision to exempt the Coeur d'Alene reservation. In fact, what was in the record, again, was everything I have described, probably ad nauseum. So I will move on to the last piece, and that is the ñ Sixteen seconds left. Part three. Failing to include a prohibition against emissions that would unreasonably interfere with the enjoyment of life and property. Again, there is a lot of case law regarding an agency's failure to respond to comments, and the law is that an agency need only respond to significant comments, i.e., those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule. I submit to you that the comments my client made on this point were significant in that, again, in the record, there was ample evidence that the practice of field burning on the Coeur d'Alene reservation interfered significantly with the enjoyment of life and property, and it should have been included in the section. But most importantly, the response was limited, and so I will finish there. Thank you very much.  GOTTLIEB Thank you, Ms. Lentil. Mr. Chalmer. MR. CHALMER Good morning, Your Honors, and may it please the Court. My name is Paul Serino with the U.S. Department of Justice. I'm joined today at council table by Richard Fetter of EPA's Office of General Counsel and Julian Matthews of EPA's Office of Regional Counsel here in Seattle. This case is a challenge to a final action of the EPA in promulgating basic air pollution rules for Indian reservations in Idaho, Oregon, and Washington. The rules cover 39 reservations, numerous different types of air pollution sources, and were based on a lengthy process of consultations and outreach with states, tribes, industry representatives, and citizens groups. The issues in this case are whether the agency acted arbitrarily or capriciously in first concluding that it was not necessary or appropriate to impose upon the Coeur d'Alene tribe the rule for an agricultural burning permit program set forth in section 49.133, second, that the agency did not act arbitrarily or capriciously in adopting the imminent and substantial endangerment standard in the rule for emissions detrimental to public health or welfare, and three, that the agency did not act arbitrarily or capriciously in exempting agricultural burning from the registration and reporting rule. With respect to the standard of review, I'd like to agree that under the APA, that is the appropriate standard here. This Court has previously defined that as an agency does not act arbitrarily and capriciously when it acts rationally, based on relevant considerations and pursuant to a delegation to the agency under the statute, and that's a very deferential standard, and the agency has exceeded that standard here. I'd also like to bring to the Court's attention a different substantive standard that comes from the Tribal Authorities Rule, which allows EPA to promulgate regulations that are necessary or appropriate for Indian reservations. So while we have the APA standard of arbitrary and capricious, what the agency was following in determining which rules were applicable to the different reservations was the necessary or appropriate standards. Where does that come from? Excuse me? Where does that come from? It's called the Tribal Authorities Rule. It's in 49 CFR 11. It's a regulation. 49.11. Right. But the agency gave, as I understand it, essentially two reasons for not including the Coeur d'Alene tribe in the permitting system. One of them is the one we discussed previously, which is the fact that they had a mandatory system. The other is essentially that they didn't want it, as I understand it, that the other tribes wanted it and they didn't want it. Is that a legitimate consideration? Absolutely. Why? Well, there's an executive order that directs agencies to defer to tribes where possible. It doesn't say that, I don't think. I think it says consult with them. I think it says both. I think it says consult with the tribes and defer to those tribes where possible. I'd also point out that EPA has its own policy of considering tribes to be the decision-makers on matters affecting environment and public welfare on their reservations. So, you know, we're talking about one sovereign dealing with another sovereign here. And I believe it would have been arbitrary and capricious. But this statute, i.e., the Clean Air Act, says to basically treat them the same as states. No? In certain things. But I don't – this may not be one of those items, Your Honor. I'm not an expert in that area. But the tribal authority's rule was applicable to the decision-making by the agency here. I'd like to turn to the rule on agricultural permitting by making clear that any differences between Section 49.133 and the Coeur d'Alene's existing mandatory plan are trivial. They're minimal. In fact, petitioners said as much in their comment letter to the agency, which I'd like to read from briefly. Petitioner said in commenting to the agency that the permitting program proposed in this section would not eliminate the threat to public health posed by grass field residue burning on the Coeur d'Alene reservation or necessarily reduce the total quantity of PM emissions from burning within the reservation. So that's them basically saying it's not going to change anything coming off the reservation. So what are we talking about? How can it be arbitrary and capricious for the agency not to impose a program that has no difference? But as part of the larger context here, EPA was acting in a situation where all of the tribes, all of the reservations, 38 of the 39 reservations were in attainment with the National Ambient Air Quality Standards. So there was no specific problem to address in that respect. The one, there is a, there was a state implementation plan for the Sandpoint area. So that area was covered, but that wasn't being addressed by this federal implementation plan for the tribes. You also have to remember that these were the very first building blocks of what the EPA hoped would be the development of air quality rules for these reservations. It's the first of its kind in the country. In many ways, it's like a pilot program. So EPA imposed a set of very basic rules to all 39 reservations, and it offered additional rules to the reservations if they requested them. This permitting program was an additional rule that two tribes requested and received, and none of the other tribes requested, including Coeur d'Alene, which, as we see here, had a basically, I don't want to say identical, but a plan with very insignificant differences. What are the differences? I mean, I think we outlined them in the chart on our page 29 of our brief and in the following page, but it's basically a, it doesn't specifically request a plot plan. It doesn't specifically ask for the weight of the material to be burned, and I think it doesn't request the method of the burning. I believe those are the three differences. The plot plan versus location, I think, is not much of a difference there. I think one reason for a plot plan might be that somebody in Seattle is, it might be more helpful to somebody out of State, but certainly the general location of the burning to take place would be well known to Coeur d'Alene, folks in Coeur d'Alene. But I think the Petitioners have admitted that the emissions from particulate matter coming from the reservation wouldn't change. What about, and this flows over into the reporting and registration issue. You're not, however, collecting any information about that. Let me turn to that topic. I think if you look at the reporting and registration rule, you'll find that its requirements have about 13 or 14 different sections, categories of information. The first five or so are basic name, address, and location type of thing, which I think are pretty much covered by the Coeur d'Alene program anyway. The remainder say, I think we're talking sub-paragraphs 6 through 13 of E2 on 49.138, not really applicable to open burning or agricultural burning. They're more appropriately directed to stationary sources, sources with stacks. You see there's, you know, they're asking about fuel used and product produced and asking for flow charts and controls. It just doesn't That's fairly circular in the sense that you could have written if what you were trying to find out is how much of this particulate was actually getting in the air, you could have written rules that would have gotten that information. I suppose so. But part of, and just as a quick aside, if you want to know the purposes for this rule, I would look at the proposed rule, which sets them out very clearly. Not a fact sheet. Counsel was reading from a fact sheet when she was articulating the purported purposes for this rule. The better place to look is a proposed rule. One of the proposed rules is to make sure that the protections provided on the reservations were similar to protections provided off the reservations, that there was no, that's what we call leveling the playing field or filling the regulatory gap. And the agency found here, Your Honor, that exempting open burning and agricultural burning also had been done in the neighboring jurisdictions. So it was consistent with that purpose of these fifths. I'd note one other thing, since we're talking about the registration requirement. This is the third different argument we've heard from petitioners about why this rule was arbitrary depreciation or why the exemption of the agricultural burning from the rule was arbitrary and capricious. First they said that it was important for them to gather the data. That was in their comment. Then in their brief they said, well, we need the information so we're able to flee, so our members are able to flee from the Sandpoint area. And now I heard a new one, that EPA needs it now to assess the leveling the playing field aspect of this rule. I mean, I don't think any of those are valid arguments in themselves, and certainly changing them twice undercuts the force of their challenge to that argument. I'd like to turn briefly to the challenge concerning Section 135, which is the rule concerning emissions detrimental to public health and welfare. The standard chosen by EPA for that rule is the imminent substantial endangerment standard. It's the same standard that applies to the emergency section of the Clean Air Act, Section 303. EPA had a previous standard in the rule, in the proposed rule, of is or would likely be injurious to public health or welfare. Comments received on the proposed standard were that it was vague, too broad, and difficult to enforce. EPA agreed with those comments and selected the imminent substantial endangerment standard. It had issued a standard that was familiar to the agency, as it had issued a policy on how to interpret the imminent substantial endangerment standard. It was more clearly defined. And certainly in an area in which the agency is selecting a standard that gives it the right to take action against sources, pollution sources, it's – I would submit that that's an area of particular deference to the agency. Is it – I assume that there are – I mean, this is maybe your erroneous assumption, that there are similar rules applicable to States elsewhere. Yes. And EPA has written. And this problem, one would assume, has to have been addressed repeatedly. I'm sorry, Your Honor. A particular subproblem must have been addressed in other rules applicable to other areas. What problem? The Clean Air Act. The problem of rules for emissions detrimental to human health and welfare. I think this is a common – And you would think that there would be some common solution to that. This is a very general rule that is designed, as I gather, to be sort of a catch-all that says whatever else you're doing, don't emit air pollution that's going to be detrimental to human health and welfare. Well, I think the purpose of this section is to provide an administrative mechanism for the agency to take action against sources. What I'm saying is, aren't there other rules in which one or the other of these versions has been adopted, applicable to other geographical areas? I believe so, Your Honor. Do you know what standard has been adopted? As I stand here now, I don't. Is there any reason in the world why this one should be different? And I don't know the answer either, but it seems very peculiar to be doing this on an ad hoc basis, when this particular thing, there's nothing geographically distinct about it. Yeah. I don't think it's an ad hoc decision, Your Honor. I think they considered a standard for this rule. And the agency – Well, on a geographically distinct basis, why should this area have one rule about whether it's – whether the standard is injurious to human health and welfare or something else? Wait. This rule applies to all of the reservations. I understand that, but it doesn't apply to the State of California. I don't know. It might. That wasn't a topic that we agreed to. Unless there are further questions, I'd conclude and request that the Court deny the petition to review. Thank you. Okay. Thank you. Counsel, thank you for connecting your argument, both of you. The matter at argued will be submitted.  case, which involves the Idaho SIPs or SIPs or however one refers to them.
judges: Alarcon, Rymer, Berzon